**John Thomas BROWN, Sr.,**
**Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee**
**(Plaintiff).**

**No. 5767.**

Supreme Court of Wyoming.

April 1, 1983.

Rehearing Denied May 18, 1983.

Sylvia Lee Hackl, Appellate Counsel, Wyoming Public Defender Program, Cheyenne, Gerald M. Gallivan, Director, Wyoming Defender Aid Program, and Jonathan C. Wilson, Student Intern, Wyoming Defender Aid Program, Laramie, for appellant.

A.G. McClintock, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., Allen C. Johnson, Sr. Asst. Atty. Gen., and Gay Vanderpoel, Asst. Atty. Gen., for appellee.

Before ROONEY, C.J., and RAPER, THOMAS, ROSE and BROWN, JJ.

THOMAS, Justice.

The primary contention of John Thomas Brown, Sr., which must be resolved in this case is his claim that a request for counsel which he made during an investigative interview conducted by law enforcement officers, who made no arrest, and following which Brown was free to leave, served to initiate his right to counsel as provided in the Sixth Amendment to the Constitution of the United States[1] which is applicable to the several states by virtue of the Fourteenth Amendment to the Constitution of the United States. Additional issues relating to a violation of Brown's rights under the Fifth Amendment to the Constitution of the United States[2], also applicable to the states under the Fourteenth Amendment, and the sufficiency of the evidence to sustain Brown's conviction for a violation of § 6–4–107, W.S.1977 (Cum.Supp.1982)[3], proscribing the crime of manslaughter, also are raised. We conclude that there was no violation of Brown's constitutional rights, and the evidence was sufficient to sustain his conviction. We shall affirm the judgment of conviction entered in the district court.

John Thomas Brown, Sr. (Appellant), states the issues which he asks to be resolved in this case as follows:

"Whether the interrogation of Appellant on January 19, 1982, violated his Sixth and Fourteenth Amendment rights. Whether the subsequent admission into evidence of the statements obtained therefrom constitutes error and mandates reversal of his conviction.

"Whether Appellant's statement of December 25, 1981, at 9:45 a.m. was obtained in violation of his Fifth and Fourteenth Amendment rights.

"Whether there was insufficient evidence to establish beyond a reasonable doubt that Appellant acted with culpable neglect or criminal carelessness."

No additional statement of the issues has been made by the State of Wyoming. It has attached titles to the several sections of its brief, but the State contents itself with meeting the arguments of Appellant without restating the several issues.

A recitation of the underlying events which led to Appellant's conviction of manslaughter is helpful in understanding the material facts surrounding his several statements to law enforcement officers which are the focus of this appeal. On the morning of December 22, 1981, following an all-night drinking spree, Appellant and seven other members of his family went hunting. The others in the group were Appellant's brother Andrew, Calvin Yellowbear, Appellant's wife, two of Andrew's daughters, Appellant's aunt Nora, and his uncle Frank. The party traveled in two vehicles, a pickup truck belonging to Appellant, and a station wagon owned by his brother Andrew. The adult members of the party continued to consume large amounts of alcoholic beverages while hunting. During the course of

1. The Sixth Amendment to the Constitution of the United States provides in pertinent part as follows:

"In all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defence."

Brown does not rely upon the parallel provision found in Art. 1, § 10 of the Constitution of the State of Wyoming, which states:

"In all criminal prosecutions the accused shall have the right to defend in person and by counsel, * * *."

2. The Fifth Amendment to the Constitution of the United States provides in pertinent part as follows:

"No person * * * shall be compelled in any criminal case to be a witness against himself * * *."

With respect to this contention also Brown does not rely upon the parallel language of Art. 1, § 11 of the Constitution of the State of Wyoming, which provides in pertinent part as follows:

"No person shall be compelled to testify against himself in any criminal case * * *."

3. Section 6–4–107, W.S.1977 (Cum.Supp.1982), provides:

"Whoever unlawfully kills any human being without malice, expressed or implied, either voluntarily, upon a sudden heat of passion, or involuntarily, but in the commission of some unlawful act, except as provided in W.S. 31–5–1117, or by any culpable neglect or criminal carelessness, is guilty of manslaughter, and shall be imprisoned in the penitentiary not more than twenty (20) years."

the day the group made a number of stops to refuel the two vehicles and to purchase additional supplies of alcoholic beverages. Around sundown of that day, while the party was traveling on Muskrat Road north of Shoshoni and heading toward Riverton, a fight commenced involving Calvin Yellowbear and Andrew Brown, who at that time was driving the pickup truck. Andrew Brown pulled the truck off the road and stopped in order to permit his two daughters, who also were riding in the truck, to escape. Appellant then stopped the station wagon and went to the passenger's side of the pickup truck in order to break up the fight between Andrew and Calvin Yellowbear. There were two loaded rifles, one a .270 caliber, and the other a .22 caliber, in the cab of the pickup truck between the two fighting men. Appellant reached in through the open passenger door and grabbed the .22 rifle. As he attempted to pull it toward him out of the cab the gun discharged, and the bullet struck Yellowbear in the side.

Yellowbear then fell out of the pickup onto the ground. While he was on the ground Andrew Brown attempted to kick him, but he was pushed away by Appellant. Appellant then helped Yellowbear back into the cab. Yellowbear complained to Andrew Brown and Nora Brown of his injury, and he requested that he be taken to a hospital. It is not clear from the record whether Appellant knew of this request, but the record does reflect that Appellant and Nora had to help Yellowbear back into the cab at some later time after he had gotten out of the pickup to use the rest room. Later the station wagon in which part of the party was traveling ran out of gas, and both vehicles then stopped for the night.

During the night Calvin Yellowbear died from his wounds. The following morning Appellant covered Yellowbear's corpse with a blanket and left it in his pickup truck, which then was hidden. Appellant and the rest of the party returned to town to decide what they should do. A two-day drinking party followed, during which time the body was not discovered. No report of the shooting was made until the night of December 24, 1981, when Appellant informed his father and his brother Charles that Yellowbear was dead. During the early morning hours of Christmas Day, 1981, Appellant and the other members of the hunting party were picked up by the Ft. Washakie Police Department, and they were taken into Lander for interview. Following an initial interview, Appellant accompanied the officers onto the Wind River Indian Reservation where he showed them the hiding place of his pickup truck, which contained the body of Calvin Yellowbear.

The initial interview of Appellant by the officers investigating Yellowbear's death was conducted early in the morning on December 25, 1981, beginning at 6:53 a.m. Prior to any questioning of Appellant he was advised of his rights under the constitution in accordance with the mandate of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974, reh. denied *California v. Stewart,* 385 U.S. 890, 87 S.Ct. 11, 17 L.Ed.2d 121 (1966). At that time Appellant signed an appropriate document pursuant to which he manifested his waiver of those constitutional rights. In the course of this first interview Appellant advised the officers that Yellowbear had been shot accidentally by Andrew Brown. It was at this juncture that Appellant conducted the officers to the place where he had hidden his pickup truck.

After that Appellant was taken into Riverton, Wyoming, where a second interview began at 9:45 a.m., approximately two hours after the conclusion of the initial interview. Appellant was not readvised of his constitutional rights in accordance with *Miranda v. Arizona,* supra, at that time, but he did say that he still understood his rights. A transcript of the tape of this interview which was admitted during Appellant's trial, shows the following colloquy between Appellant (JB) and the investigating officer, Sergeant Jack Coppack (JC):

"JC: Today's date is December 25, 1981, time is 0945 hours. Present are Sgt. Ted Watan of Fort Washakie P.D., Sgt. Jack Coppock of Fremont County Sheriff's Of-

fice and John T. Brown Sr. John, this is another tape and it's about two hours later. We were over in Lander interviewing you about this shooting, is that correct, it's case 81–2074 the shooting of Calvin Yellowbear. You were advised of your rights at that time, do you still understand your rights?

"JB: Yes.

"JC: Okay and for the benefit of the tape you told us that you wanted to take us and show us where the body had been hidden. Is that correct?

"JB: Yes.

"JC: Okay so we went out there and we found the body in your pickup truck on the reservation on Wyoming 136 mile post 12.2 and then to the south approximately, maybe two miles. Is that correct?

"JB: Yes.

"JC: Okay, we stopped the tape because we ran out of it over in Lander. No promises or threats had been made to you or anything like that, is that correct?

"JB: Yeah, no promises or threats."

During this interview Appellant revised his earlier statement and said that Calvin Yellowbear had been shot when Yellowbear dropped the rifle and it discharged.

Later in the afternoon of December 25, 1981, a third interview was conducted between the investigating officers and the Appellant. In the course of this third interview Appellant expressed a desire to consult with counsel prior to being questioned further. Because of this action on the part of Appellant statements which were obtained from him during the course of this third interview were suppressed by the district judge following a pretrial hearing. The State of Wyoming has made no attempt to seek review of that portion of the district court's order. The second interview of December 25, 1981, is the object of Appellant's second claim of error in this appeal.

The next contact that Appellant had with the investigating officers was on December 27, 1981, when Appellant furnished a handwritten exculpatory statement in the office of the Fremont County Sheriff at Lander.

This statement was given by Appellant after he had been advised of his constitutional rights in accordance with *Miranda v. Arizona,* supra, and after he had signed another waiver of those rights. On the next day, December 28, 1981, Appellant signed an affidavit in the office of the county and prosecuting attorney for Fremont County in which he stated that the only individual who had a gun in his hands at the time of the shooting was Andrew Brown. Ultimately, this affidavit, together with other information which had been developed by the police officers during their investigation, led to the filing of first degree murder charges against Andrew Brown for the killing of Yellowbear. Subsequent information which was developed, including the performance of an autopsy on Yellowbear's body, resulted in the charges against Andrew Brown being reduced to aggravated assault and battery and aiding and abetting Appellant in committing manslaughter.

Some three weeks later, on January 19, 1982, Appellant was arrested in Lander, Wyoming. After again being advised of his rights in accordance with *Miranda v. Arizona,* supra, Appellant was taken to the office of the Fremont County Attorney for further questioning. After he had arrived at that office, the county attorney again gave him the advice with respect to his rights in accordance with *Miranda v. Arizona,* supra, and he asked Appellant whether he wanted to make a statement. Appellant agreed to make a statement, but he refused to permit the interview to be recorded. It was in this statement, which is the subject of the first claim of error in this appeal, that Appellant admitted accidentally firing the shot which killed Calvin Yellowbear. The next day a criminal complaint was filed in which Appellant was charged with the crime of manslaughter, and an arrest warrant then was issued for the arrest of Appellant and his brother Andrew Brown.

Prior to trial a motion was made on behalf of Appellant to suppress all statements which he had made to the investigating officers "on the grounds that such statements were made while this defendant was

under investigation for the death of Calvin Yellowbear; were made without the presence of counsel after requesting the same, involuntarily, and without full knowledge of his rights against self incrimination, under the Fifth and Fourteenth Amendments to the Constitution of the United States of America." The district court held a hearing on the motion and then issued an order immediately before the trial pursuant to which the third statement made on December 25, 1981, was suppressed. The trial court granted that aspect of the motion because that interview was conducted and the statement made after Appellant had requested an attorney. The trial court refused to suppress any of the other statements, but leave was given to Appellant to raise additional objections to the admission of the inculpatory statement made on January 19, 1982.

Appellant was tried before a jury beginning on April 27, 1982. His motion for a judgment of acquittal, made at the close of the State's case in chief, on the ground that the evidence did not present a prima facie case as to the critical element of culpable neglect or criminal negligence, was denied. The case was given to the jury for its verdict, and a verdict of guilty was returned. Following a presentence investigation and report, the Judgment and Sentence was entered on August 6, 1982. Appellant was sentenced to a term of five years in the Wyoming State Penitentiary with provision that he should be eligible for parole at the conclusion of two years, and this appeal is taken from that Judgment and Sentence.

The first issue raised by Appellant manifests an effort to constitute as the triggering event to initiate his right to counsel under the Sixth Amendment to the Constitution of the United States the right of Appellant, prior to any questioning, to be advised that he has a right to the presence of an attorney, at least if he makes such a request. Appellant argues that since he did indicate on December 25, 1981, that he desired to consult with an attorney prior to talking further with the investigating officers, the inculpatory statement obtained after his arrest on January 19, 1982, was obtained in violation of his right to counsel under the Sixth Amendment to the Constitution of the United States. Appellant's position is that any statement obtained in violation of his Sixth Amendment right to counsel is not admissible into evidence. In submitting this argument, Appellant relies primarily upon the recent decision in *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378, reh. denied 452 U.S. 973, 101 S.Ct. 3128, 69 L.Ed.2d 984 (1981). Appellant alludes particularly to the following language:

" * * * [W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiated further communication, exchanges or conversations with the police." *Edwards v. Arizona,* supra, 451 U.S. at 484–485, 101 S.Ct. at 1884–85.

We perceive the primary difficulty with Appellant's reliance upon *Edwards v. Arizona,* supra, to be that the Supreme Court of the United States there specifically refused to decide whether Edwards' Sixth and Fourteenth Amendment rights, as construed and applied in *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), were infringed by the State. *Edwards v. Arizona,* supra, 451 U.S. at 480, n. 7, 101 S.Ct. at 1882–83, n. 7. We find ourselves in accord with this position taken by the Supreme Court of the United States. It must be remembered that the right to counsel identified in *Miranda v. Arizona,* supra, is one of the procedural safeguards which is to be used "to secure the privilege against self-incrimination." *Miranda v. Arizona,* supra, 384 U.S. at 444, 86 S.Ct. at 1612.

■ The Sixth Amendment right to counsel attaches only when adversarial criminal proceedings against an accused have been commenced. *Moore v. Illinois,* 434 U.S. 220, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977); *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972); *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527 (1932). See *Auclair v. State,* 660 P.2d 1156 (Wyo. 1983). While it is clear in this case that Appellant requested counsel during the course of the third interview on December 25, 1981, it is equally clear that the right to counsel prescribed in the Sixth Amendment had not then attached. The mere fact that Appellant was being questioned by police officers during their investigation of Calvin Yellowbear's death does not trigger the protection provided in the Sixth Amendment of the Constitution of the United States. The adversarial criminal proceedings had not been commenced against the accused as of that time.

In any event, *Edwards v. Arizona,* supra, is distinguishable from Appellant's case by differences in the facts. Edwards had been arrested pursuant to a warrant issued upon a criminal complaint that was filed against him charging him with robbery, burglary and first degree murder. Edwards, after being advised of his constitutional rights in accordance with *Miranda v. Arizona,* supra, waived those rights and submitted himself to questioning. During the course of the interrogation Edwards raised the possibility of making a deal with the prosecuting attorney. He then was allowed to telephone a deputy county attorney handling his case, and after concluding the conversation, Edwards said, "I want an attorney before making a deal." *Edwards v. Arizona,* supra, 452 U.S. at 479, 101 S.Ct. at 1882. The investigating officers then ceased their questioning, and Edwards was placed in a jail cell. When Edwards was informed the next morning that two detectives wished to speak with him he replied that he did not want to speak with anyone. He was taken to the interrogation room by a guard anyhow, and the guard told him that he had to talk. The two detectives then readvised

Edwards of his rights in accordance with *Miranda v. Arizona,* supra, and played for him a taped confession of his accomplice. After listening to the tape for several moments, Edwards then made a statement in which he implicated himself in the crime.

Several distinctions are quickly found when Appellant's circumstances are compared with those of Edwards. Appellant was not under arrest when he asked to consult with an attorney. Appellant was free to obtain counsel at any time after December 25, 1981, and prior to his arrest on January 19, 1982, but apparently he did not do so. Appellant was not held in custody by the investigating officers. After December 25, 1981, Appellant gave at least two other statements to law enforcement officials which were exculpatory in nature. The statement which ultimately was given on January 19, 1982, was preceded by complete advice with respect to his rights under *Miranda v. Arizona,* and the statement was furnished knowingly and voluntarily. No one told Appellant that he "had to" talk with the officers. These distinctions would be sufficient to preclude the application of *Edwards v. Arizona,* supra, to Appellant's situation. See *Jacks v. Duckworth,* 651 F.2d 480 (7th Cir.1981), cert. denied 454 U.S. 1147, 102 S.Ct. 1010, 71 L.Ed.2d 300 (1982), reh. denied 456 U.S. 984, 102 S.Ct. 2262, 72 L.Ed.2d 865 (1982); and *United States v. Skinner,* 667 F.2d 1306 (9th Cir.1982).

In making this argument Appellant also relies upon propositions included in *Dryden v. State,* Wyo., 535 P.2d 483 (1975). In parallel with the views set forth above we conclude that those propositions are not applicable in this case. Dryden was arrested for the murder of a woman with whom he had been living. He was advised of his constitutional rights in accordance with *Miranda v. Arizona* by the arresting officer, and Dryden clearly and unequivocally requested the assistance of counsel, stating, "I know my rights, I will get a lawyer when I get to town." Even though Dryden had invoked his right to have counsel present, he was subjected to numerous interrogations by law enforcement authorities who

did not properly advise him further of his rights or ascertain whether he understood them. Dryden was held in custody and interrogated on different occasions for nearly a week prior to any attention being given to his request for counsel. This court held, in reversing Dryden's conviction, that his "interrogation was illegally conducted in violation of his constitutional rights under the fifth and fourteenth amendments to the Constitution of the United States and under § 11 of Art. 1 of the Constitution of the State of Wyoming." *Dryden v. State,* supra, 535 P.2d at 497.

As this court noted in *Daniels v. State,* Wyo., 644 P.2d 172 (1982), the holding in Dryden foreshadowed that in *Edwards v. Arizona,* supra, yet it is no more efficacious in the cause of Appellant's appeal than is the decision of the Supreme Court of the United States in *Edwards.* Prior to the Sixth Amendment right to counsel attaching, no violation of that Sixth Amendment right to counsel can occur. At the time that Appellant asserted his right to counsel it had not attached, and it could not attach prior to his arrest on January 19, 1982. On that occasion he agreed to talk with the investigating officers without the presence of counsel. We conclude that this argument is without merit. Appellant's failure to consult with counsel prior to his arrest did not foreclose the law enforcement officers from interrogating him after his arrest once they had given him a proper statement of his constitutional rights in accordance with *Miranda v. Arizona,* supra, and he had given them a waiver of those rights.

We turn then to the second claim of error submitted by Appellant. In this argument he urges upon the court the proposition that the statements which he made during the second interrogation which began at 9:45 a.m. on December 25, 1981, were admitted improperly against him at his trial because the law enforcement authorities failed to readvise him of his consti-

tutional rights in accordance with *Miranda v. Arizona,* supra, prior to beginning the second round of questioning. In addressing this issue we will assume, without necessarily being convinced, that this was in fact a second interrogation rather than simply a continuation of the first interrogation. We do note that Appellant was advised of his constitutional rights in all respects less than three hours before the interrogation in question occurred. No issue is raised here regarding the admission of statements obtained from Appellant as a result of the earlier interview, which we interpret as a concession that Appellant did knowingly and voluntarily waive his right to remain silent at that time. We note further that during the intervening period Appellant was cooperating with the authorities by leading them to the place where he had hidden Calvin Yellowbear's corpse.[4]

Appellant's argument is that even though he had been informed of his constitutional rights in accordance with *Miranda v. Arizona,* supra, the failure to readvise him of those rights prior to the second interview violated the standards articulated in that case for the admission of custodial statements. This contention is not novel. Numerous federal and state courts have had occasion to deal with it, and those courts uniformly have rejected the notion that a complete readvisement is necessary in every instance in which there is an interruption in the interrogation. *United States ex rel. Henne v. Fike,* 563 F.2d 809 (7th Cir.1977), cert. denied 434 U.S. 1072, 98 S.Ct. 1257, 55 L.Ed.2d 776 (1978); *Biddy v. Diamond,* 516 F.2d 118 (5th Cir.1975), cert. denied, 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 194 (1976); *United States v. Osterburg,* 423 F.2d 704 (9th Cir.1970), cert. denied 399 U.S. 914, 90 S.Ct. 2216, 26 L.Ed.2d 571 (1970); *Miller v. United States,* 396 F.2d 492 (8th Cir.1968), cert. denied 393 U.S. 1031, 89 S.Ct. 643, 21 L.Ed.2d 574 (1969); *State v. Allen,* 111 Ariz. 546, 535 P.2d 3 (1975); *Williams v. State,* 244 Ga. 485, 260 S.E.2d 879

---

4. Appellant does not argue that the evidence obtained as a result of his cooperation with the police was improperly used against him at trial.

See *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

(1979); *People v. Patton,* 90 Ill.App.3d 263, 45 Ill.Dec. 515, 412 N.E.2d 1097 (1980); *Grey v. State,* Ind., 404 N.E.2d 1348 (1980); *State v. Jump,* Iowa, 269 N.W.2d 417 (1978); *State v. Boyle,* 207 Kan. 833, 486 P.2d 849 (1971); *State v. McMorris,* La., 343 So.2d 1011 (1977); *Commonwealth v. Look,* 379 Mass. 893, 402 N.E.2d 470 (1980), cert. denied 449 U.S. 827, 101 S.Ct. 91, 66 L.Ed.2d 31 (1980); *State v. Myers,* Me., 345 A.2d 500 (1975); *State v. Harvey,* Mo., 609 S.W.2d 419 (1981); *Taylor v. State,* 96 Nev. 385, 609 P.2d 1238 (1980); *State v. Small,* 293 N.C. 646, 239 S.E.2d 429 (1977); *Commonwealth v. Gray,* 473 Pa. 424, 374 A.2d 1285 (1977); and *State v. Gilcrist,* 91 Wash.2d 603, 590 P.2d 809 (1979). We perceive the rule of these cases to be that the court has a duty to determine under all the circumstances whether the prior warnings were effective to sufficiently advise the accused of his constitutional rights so that the prior voluntary and knowing waiver of those rights continued its efficacy.

Several factors have been identified as having a bearing upon this determination. Among them are the interval of time since the accused had been advised properly of his rights; whether the interviews were part of a continuing interrogation; whether the same officer who had furnished the earlier advice to the accused of his constitutional rights also was conducting the subsequent interview; the physical circumstances surrounding the furnishing of advice as to rights and the subsequent interrogations; and the apparent intellectual and emotional state of the accused at the time he was informed of his rights and during the subsequent interrogations. *Miller v. United States,* supra, 396 F.2d at 496; *Williams v. State,* supra, 260 S.E.2d at 883; *State v. Myers,* supra, 345 A.2d at 502; *State v. Small,* supra; and *Commonwealth v. Dixon,* 475 Pa. 365, 380 A.2d 765 (1977). Noting that these criteria essentially are matters of fact to be monitored by the trial court, we agree that when tested under them the circumstances disclosed in this case demonstrate that the failure to furnish complete readvice to Appellant of his constitutional rights in accordance with *Miranda v. Arizo-*

*na,* supra, prior to the second interview on December 25, 1981, did not make those statements inadmissible in evidence.

■ The last contention of Appellant in this case raises the sufficiency of the evidence against him to sustain a conviction of manslaughter. Recently this court reaffirmed the summary of the appellate rules which must be applied to such an issue before this court:

> " ' "The oft-repeated rule by which we test the sufficiency of evidence on appeal of a criminal matter is that we examine and accept as true the evidence of the prosecution, leaving out of consideration entirely the evidence of defendant in conflict therewith, and we give to the evidence of the prosecution every favorable inference which may reasonably and fairly be drawn therefrom. Stated another way—it is not whether the evidence establishes guilt beyond a reasonable doubt for us, but rather whether it is sufficient to form the basis for a reasonable inference of guilt beyond a reasonable doubt to be drawn by the jury when the evidence is viewed in the light most favorable to the State. [Citations]" *Harvey v. State,* Wyo., 596 P.2d 1386, 1387 (1979) * * *.' *Grabill v. State,* Wyo., 621 P.2d 802, 803 (1980)." *Harries v. State,* Wyo., 650 P.2d 273, 274 (1982).

Appellant argues vigorously that there is no reasonable basis in the evidence to support a conclusion by the jury that he acted in a culpably negligent or criminally careless manner. The decisions of this court under the statutory predecessor to § 6-4-107, W.S.1977 (Cum.Supp.1982), are instructive in determining what conduct is proscribed by the term "culpable negligence" or "criminal carelessness." Previously we have recognized that these terms are synonymous and proscribe behaviour which not only is more than ordinary negligence but which is criminal or culpable in character. *Thomas v. State,* Wyo., 562 P.2d 1287 (1977); *State v. McComb,* 33 Wyo. 346, 239 P. 526, 41 A.L.R. 717 (1925).

In the instant case the district court gave the following definitional instruction with respect to these terms:

"The terms culpable neglect and criminal carelessness are synonymous. They mean the failure to exercise any care, or the exercise of so little care that you are justified in believing that the person whose conduct is involved was wholly indifferent to the consequences of his conduct and to the welfare of others. 'Culpable neglect' and 'criminal carelessness' denote a reckless disregard for the safety of life, a heedless indifference to the rights and safety of another notwithstanding reasonable foresight that injury or death could result to another." [5]

No objection was made to this instruction by Appellant, and he does not contend in this appeal that it is incorrect. Under the circumstances this instruction contains the law of this case (see *Cox v. State,* Wyo., 651 P.2d 1137 (1982), and we hold there is sufficient evidence in the record to justify a reasonable finder of fact in the conclusion that the element of culpable negligence or criminal carelessness was established beyond a reasonable doubt.

Appellant, while in a state of extreme intoxication, handled a loaded firearm, and it discharged into the cab of a pickup truck occupied by another individual. We will take advantage of this opportunity to advise the people of the State of Wyoming that in the view of this court the handling of a loaded firearm while intoxicated in and of itself is culpable neglect and criminal carelessness. This record further discloses that Appellant knew that the rifle had been discharged; that it had been pointed into the cab of the truck; and that Calvin Yellowbear was in the truck. Immediately after the discharge of the firearm Yellowbear fell out of the truck onto the ground, and he required assistance to get back into the truck. The jury was entitled to infer from the fact that Appellant had to help Yellowbear back into the truck, not only after the shooting, but later as well, that Appellant knew or should have known that Yellowbear had been hit by the bullet. An inference of culpable neglect or criminal carelessness could have been drawn from those circumstances and the subsequent failure to seek any sort of medical treatment for Yellowbear. Taken as a whole, the facts disclosed by the evidence in this record are sufficient to support a finding that the acts of Appellant constituted a "reckless disregard for the safety of life, [and] a heedless indifference to the rights and safety of another notwithstanding reasonable foresight that injury or death could result to another."

Having concluded that there is no error in any of the respects complained of by Appellant, it is our decision that the conviction by the jury and the judgment and sentence imposed by the trial court must be affirmed.

5. This definition is more elaborate than that contained in WPJIC § 7.510, which provides:

"The terms 'culpable neglect' and 'criminal carelessness' have the same meaning. Culpable negligence and criminal carelessness are much more than ordinary negligence and must be of a gross or flagrant character, such as would show wantonness or recklessness, or would demonstrate a reckless disregard of human life or the safety of others, or an indifference to consequences equivalent to criminal intent."